1

2

3

4

5                          IN THE UNITED STATES DISTRICT COURT

6                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  SUMITOMO MITSUBISHI SILICON              No. C 05-2133 SBA
   CORPORATION, et al.,                     (*Related to Case No. C 01-4925*)

9              Plaintiffs,

10                                          **ORDER**
       v.

11 MEMC ELECTRONIC MATERIALS, INC.,

12             Defendant.
   _____/

13

14         Currently before the Court are: Defendant's Motions for Summary Judgment and for Judgment

15 On The Pleadings; Defendant's Motions to Exclude the Testimony of A. James Isbester, Dr. Frank M.

16 Gollup and Carl G. Degen; and Defendant's Objections to Plaintiffs' Evidence Submitted In Support of

17 Its Opposition to Defendant's Motion for Summary Judgment and Motions to Exclude. Having read and

18 considered the arguments presented by the parties in the papers submitted to the Court, the Court finds

19 this matter appropriate for resolution without a hearing. For the reasons that follow, the Court GRANTS

20 Defendant's Motions for Summary Judgment and for Judgment On The Pleadings, Defendant's motions

21 to exclude testimony are DENIED AS MOOT, and Defendant's Objections to Plaintiffs' Evidence are

22 OVERRULED AS MOOT.

23

24

25

26

27

28

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

## BACKGROUND

**I.      PROCEDURAL BACKGROUND**

        This case is related to *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corporation*, et al., Case No. CV 01-04925 SBA ("Related Case").  MEMC Electronics Materials, Inc. ("MEMC") filed the Related Case in December of 2001 against Mitsubishi Materials Silicon Corp., Mitsubishi Silicon America Corp., Sumitomo Mitsubishi Silicon Corp., SUMCO USA Corp. and SUMCO USA SALES Corp. (collectively, "SUMCO") and their predecessors in interest for infringement of U.S. Patent No. 5,919,302 ("the '302 patent") based upon SUMCO's alleged sale and importation of certain silicon wafers.

        **A.      The Related Case**

        In the Related Case, SUMCO filed a motion for summary judgment, alleging, *inter alia*, that its activities could not constitute infringement under 28 U.S.C. § 271(b).  This Court granted summary judgment against MEMC's infringement claim.  Docket No. 297.[1]  SUMCO then filed a motion for attorney fees and sanctions.  Docket No. 403.  This Court denied SUMCO's motion, finding that MEMC's pre-filing investigation was reasonable:

> Considering the information MEMC derived from the Competitor Analysis and what MEMC knew about the silicon wafer industry in general and about its own dealings with Samsung in particular, MEMC's belief, at the time it filed suit, that SUMCO's pure silicon wafers infringed the '302 Patent cannot be characterized as frivolous or unjustified.

Docket No. 433 at 6.

        MEMC appealed the summary judgment of zero damages to the Federal Circuit and SUMCO cross-appealed the Court's denial of its motion for attorney fees.  The Court of Appeals affirmed the

_____

[1] The docket numbers cited in this paragraph correspond to the docket numbers for the Related Case, Case No. CV 01-04925 SBA.

2

Court's finding that MEMC's pre-filing investigation was reasonable: "As far as MEMC's investigation prior to filing suit for direct infringement under 271(a) is concerned, there is evidence that MEMC's attorneys performed a good faith, informed comparison of the claims of the '302 patent against the accused wafers." *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1382 (Fed. Cir. 2005).

The Federal Circuit also reversed in part the summary judgment of zero damages, finding that a reasonable jury could conclude that SUMCO's activities could constitute inducing infringement under 35 U.S.C. § 271(b):

> [A] reasonable jury could conclude that the e-mail communications between SUMCO and Samsung Austin in the United States represent product support which enabled Samsung Austin to purchase and use the accused wafers…. Moreover, the series of e-mails between SUMCO and Samsung Austin provide sufficient circumstantial evidence for a reasonable jury to conclude that SUMCO was not only aware of the potentially infringing activities in the United States by Samsung Austin, but also that SUMCO intended to encourage those activities.

*Id.* at 1380.

Following remand, the parties each filed motions for summary judgment relating to the validity of the '302 patent.  On February 24, 2006, the Court granted SUMCO's summary judgment motion on the ground that the patent was invalid for lack of enablement. However, the Court also granted MEMC's motion for summary judgment against SUMCO's anticipation affirmative defense, finding that none of the art cited by SUMCO affected the validity of the asserted claims of the '302 patent under 35 U.S.C. §§ 102 or 103.  Both parties have again appealed this Court's ruling to the Federal Circuit.

**B.      The Current Lawsuit**

In July 2004, just days after the Court issued its order denying SUMCO's motion for attorney fees and sanctions, SUMCO filed the current lawsuit against MEMC, alleging attempted monopolization and patent misuse, and seeking declarations of non-infringement, invalidity, and unenforceability of the

'302 and '380 patents. Despite the fact that the related case had been proceeding before this Court for three years, SUMCO filed its complaint in this action in Delaware. The case was transferred from the United States District Court for the District of Delaware to this Court in May 2005.

MEMC answered by denying SUMCO's claims and filing counterclaims for patent infringement. On June 5, 2006, this Court dismissed SUMCO's claims for declarations of non-infringement, invalidity, and unenforceability of the '302 and '380 patents, as well as MEMC's counterclaims for infringement of those patents, for the reasons described below. Docket No. 194.

## II.     TECHNICAL AND FACTUAL BACKGROUND

### A.     The '302 Patent

The Related Case revolved around a patent relating to "pure" or "perfect" silicon, used in the manufacturing of silicon wafers. Both MEMC and SUMCO supply silicon wafers to the semiconductor industry. The '302 Patent, which is entitled "Low Defect Density Vacancy Dominated Silicon," was issued on July 6, 1999 and claimed an invention related to the preparation of semiconductor grade single crystal silicon, which is used, in wafer form, in the manufacture of electronic components such as integrated circuits. *See* 302:1:9-16.[2] Single crystal silicon, which is the starting material for most processes for the fabrication of semiconductor electronic components, is commonly prepared by what is known as the "Czochralski" method. *See* 302:1:17-37. In this method, polycrystalline silicon is charged to a crucible and melted, a seed crystal is brought into contact with the molten silicon, and a single crystal is grown by slow extraction.

Depending on the method used to produce the crystal, certain defects can form in the crystal growth chamber as the crystal cools after solidification. *See* 302:1:38-55. Such defects arise, in part,

---

[2]Citations to the specifications for the '302 Patent are cited herein as "XXX:YY:ZZ" with "XXX" denoting the patent number, "YY" denoting the column, and "ZZ" denoting the line (*e.g.*, column 1, lines 5 through 8 of the '302 Patent is "302:1:5-8.").

United States District Court
For the Northern District of California

due to the presence of an excess of so-called "intrinsic point defects," which are known as either

"vacancies" or "self-interstitials." *Id.* Silicon crystals grown from a melt are typically grown with an

excess of one or the other type of intrinsic point defect, either crystal lattice vacancies or silicon

self-interstitials. *Id.* The type and initial concentration of these point defects in the silicon are

determined at the time of solidification and, if these concentrations reach a level of critical

supersaturation in the system and the mobility of the point defects is sufficiently high, a reaction, or an

agglomeration event, will likely occur. *Id.* Agglomerated intrinsic point defects in silicon can severely

impact the yield potential of the material in the production of complex and highly integrated circuits.

*Id.*

The '302 Patent disclosed a process specifying initial growth conditions and the temperature

range of the manufacturing process. Claim 1 reads as follows:

> A single crystal silicon wafer having a central axis, a front side and a back side
> which are generally perpendicular to the central axis, a circumferential edge,
> and a radius extending from the central axis to the circumferential edge of the
> wafer, the wafer comprising a first axially symmetric region in which vacancies
> are the predominant intrinsic point defect and which is substantially free of
> agglomerated vacancy intrinsic point defects wherein the first axially
> symmetric region comprises the central axis or has a width of at least about 15
> mm.

*See* 302.1.

Pursuant to this Court's *Markman* Order, the term "wafer" means "a thin, generally cylindrical,

slice of semiconductor material used as a base for an electronic component or circuit." The term "a first

axially symmetric region" means "a region that is symmetric about the central axis of the wafer." The

term "substantially free of agglomerated vacancy [or interstitial] defects" means "a concentration of such

agglomerated defects which is less than the detection limit of these defects, which is currently about

1000 defects/cm3." The term "agglomerated vacancy intrinsic point defects" means "defects caused by

5

the reaction in which vacancies agglomerate to produce D-defects, flow pattern defects, gate oxide integrity defects, crystal originated particle defects, crystal originated light point defects, and other such vacancy related defects." Finally, "agglomerated silicon self-interstitial intrinsic point defects" means "defects caused by the reaction in which self-interstitials agglomerate to produce dislocation loops and networks, and other such self-interstitial related defects."

**B.      Anticipation by Prior Art References**

In its Motion for Summary Judgment of Non-Infringement and Invalidity in the Related Case, SUMCO sought summary judgment in its favor on the following affirmative defenses: (1) the '302 Patent was invalid under 35 U.S.C. § 112 for lack of enablement; (2) the asserted claims of the '302 Patent were invalid under 35 U.S.C. § 102(a) or (b) as anticipated by certain prior art publications; and (3) the asserted claims of the '302 Patent were invalid under 35 U.S.C. § 102(e), (f), or (g) as anticipated by the '610 Patent.

SUMCO asserted that there were five relevant prior art publications that invalidated the '302 Patent under 35 U.S.C. § 102: (1) Reference No. 2, which was a publication entitled "Growth Parameters Determining the Type of Grown-In Defects in Czochralski Silicon Crystals;" (2) Reference No. 5, which was a publication entitled "Classification of Grown-In Microdefects in Czochralski-Grown Silicon Crystals;" (3) Reference No. 6, which was a 1987 Thesis Defense; (4) Reference No. 7, which was a publication entitled "Defect-free Silicon Crystals Grown by the Czochralski Technique; and (5) Reference No. 4, which was U.S. Patent No. 6,045,610 (the "'610 Patent").

After exhaustively examining the prior art references, the Court determined that none of them anticipated the '302 Patent, and ruled in favor of MEMC on the issue of invalidity due to anticipation. *See* Related Case, Docket No. 677 at 35-51.

**United States District Court**
For the Northern District of California

## C. Lack of Enablement

The enablement requirement of 35 U.S.C. § 112, paragraph 1, provides, in relevant part, that:

> The [patent] specification shall contain a written description of the invention, and the manner and process of making and using the [invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the [invention].

35 U.S.C. § 112.

SUMCO alleged that the '302 Patent was invalid for lack of enablement because: (1) it did not disclose any method or apparatus for obtaining a "first axially symmetric region in which vacancies are the predominant intrinsic point defect and which is substantially free of agglomerated vacancy intrinsic point defects wherein the first axially symmetric region comprises the central axis or has a width of at least about 15 mm" and (2) it did not describe any method or approach for forming a "second axially symmetric region in which silicon self-interstitial atoms are the predominant intrinsic point defect and which is substantially free of agglomerated silicon self-interstitial intrinsic point defects." MEMC opposed SUMCO's Motion arguing that the '302 Patent satisfied the enablement requirement of 35 U.S.C. § 112.

The Court found that the '302 Patent failed to disclose a specific "hot zone" design which, coupled with specific modeling and simulation work, was essential to producing defect-free zones in silicon wafers. Therefore, the Court concluded the '302 Patent is invalid for lack of enablement. *See* Related Case, Docket No. 677 at 35.

## LEGAL STANDARD

## I. SUMMARY JUDGMENT

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of demonstrating the absence of any

United States District Court
For the Northern District of California

genuine issue of material fact. *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if its resolution could affect the outcome of the action.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Horphag*, 475 F.3d at 1035. In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on the pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Federal Trade Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

However, it is not the task of the district court to scour the record in search of a genuine issue of triable fact.  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment.  *Id.* If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party.  *See Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of material fact, a district court may grant summary judgment if the opposing papers do not include or conveniently refer

to that evidence).  Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it need not do so.  *Id.* at 1029.  "The district court need not examine the entire file for evidence establishing a genuine issue of fact."  *Id.* at 1031.

## II.     NOERR-PENNINGTON IMMUNITY

The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people ... to petition the Government for a redress of grievances." U.S. Const. amend. I. Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. *Sosa v. DIRECTV, Inc.*,  437 F.3d 923, 929 (9th Cir. 2006)(*citing Empress LLC v. City & County of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005)). The doctrine arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment Petition Clause.  *See Sosa*, 437 F.3d at 930. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961), the Court held that "the Sherman Act does not prohibit ... persons from associating ... in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id. United Mine Workers v. Pennington,* 381 U.S. 657 (1965), extended this antitrust immunity to those engaging in lobbying activities directed toward executive branch officials, regardless of any anticompetitive intent or purpose. *Sosa*, 437 F.3d at 930. Subsequently, in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972), the Court extended *Noerr-Pennington* immunity to the use of "the channels and procedures of state and federal ... courts" *Id.* at 510-11.

Pursuant to the *Noerr-Pennington* doctrine, "[a] patent owner who brings a suit for infringement, without more, is generally exempt from the antitrust laws for that action."  *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304 (Fed. Cir. 2004).  However, the patent owner may be subject to antitrust liability for the anticompetitive effects of that suit if the accused infringer proves either of two

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

conditions. First, the accused infringer may show that the asserted patent was obtained through "knowing and willful fraud" within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172 (1965). *Q-Pharma,*, 360 F.3d at 1304 (*citing Nobelpharma*, 141 F.3d at 1068 ). Alternatively, the accused infringer may show that the infringement suit was "'a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Id.* (quoting *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).

### A.   *Walker Process* **Fraud**

In order to strip a patentee of its exemption from the antitrust laws due to an attempt to enforce its patent monopoly, an antitrust plaintiff  may prove that the patentee "obtained the patent by knowingly and willfully misrepresenting facts"  to the PTO. *Walker Process*, 382 U.S. at 177. The plaintiff in the patent infringement suit must also have been aware of the fraud when bringing suit. *Nobelpharma*, 141 F.3d at 1069 (citing *Walker Process* 382 U.S. at 177 & n. 6)

The Supreme Court emphasized in *Walker Process* that to "achiev[e] a suitable accommodation in this area between the differing policies of the patent and antitrust laws," a distinction must be maintained between patents procured by "deliberate fraud" and those rendered invalid or unenforceable for other reasons. 382 U.S. at 179-80 (Harlan, J., concurring). *Walker Process* fraud requires a much greater showing of materiality and intent than the showing required to establish inequitable conduct of the sort upon which a finding of patent invalidity may be based: "The heightened standard of materiality in a Walker Process case requires that the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission."  *Q-Pharma,* 360 F.3d at 1347. *Walker Process* claimants alleging fraud based on an omission, rather than a misrepresentation, must have affirmative evidence of fraudulent intent separate from the fact of the omission. *Id.* at 1348 ("when

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Walker Process* claimants wield [alleged omissions from the PTO] as a 'sword' to obtain antitrust damages rather than as a mere 'shield' against enforcement of the patent, they must prove deceptive intent independently"). "[F]or an omission such as a failure to cite a piece of prior art to support a finding of *Walker Process* fraud, the withholding of the reference must show evidence of fraudulent intent. A mere failure to cite a reference to the PTO will not suffice." *Nobelpharma*, 141 F.3d at 1071.

**B.      Sham Litigation**

Whether or not the "sham" exception applies is governed by the two-part test set forth by the Supreme Court in *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49 (1993):

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail.  Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.  Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," through the "use [of] the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon."

*Id.* at 60-61 (citations omitted) (emphasis added).  Regarding the first element of the test, the Supreme Court has ruled that, "[t]he existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation."  *Id.* at 62.

If neither exception applies, then a patentee is immune from antitrust liability for enforcing its patent rights.  Only if an antitrust claimant can prove that an exception to the doctrine applies can the substantive antitrust analysis proceed.  *Professional Real Estate Investors*, 508 U.S. at 61 ("Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity …must still prove a substantive antitrust violation").

**IV.      JUDGMENT ON THE PLEADINGS**

Federal Rule of Civil Procedure 12(c) permits judgment on the pleadings after an answer to a complaint has been filed. "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1989). "All allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party." *Qwest Commc'ns Corp. v. City of Berkeley*, 208 F.R.D. 288, 291 (N.D. Cal. 2002). In determining whether judgment on the pleadings should be entered, a district court may consider the allegations made in the complaint and the answer, materials attached to the complaint in accordance with Federal Rule of Civil Procedure 10(c), and any other materials that are (1) specifically referred to the in the complaint, (2) central to the plaintiff's claim, and (3) of uncontested authenticity. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.2006). If any other materials are to be considered, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(c);

## ANALYSIS

### I.   Antitrust Violations

Claim I of SUMCO's First Amended Complaint ("FAC") alleges "attempted monopolization" in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Specifically, SUMCO alleges that MEMC "attempt[ed] to monopolize the domestic law defect wafer silicon market" by pursuing its infringment lawsuit in the Related Case. FAC, ¶ 75.  A claim for attempted monopolization in violation of Section 2 of the Sherman Act consists of the following elements: (1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive conduct; (3) a dangerous probability of success; and (4) causal antitrust injury. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1163 n.22 (9th Cir. 2003);

*Abbott Labs. v. Brennan*, 952 F.2d 1346, 1354 (Fed. Cir. 1991).

MEMC argues that it is immune from antitrust liability under the *Noerr-Pennington* doctrine. MEMC also argues that although *Noerr-Pennington* immunity would not insulate it from antitrust claims based on its patent-pooling agreement with SEH, SUMCO has failed to present any evidence that the patent pooling agreement is in fact anticompetitive.

**A.      *Noerr-Pennington* Immunity**

**1.      *Walker Process* Fraud**

SUMCO identifies six specific claims which it alleges gives rise to a triable issue of fact as to whether MEMC committed *Walker Process* fraud on the PTO. They are, in SUMCO's words:

> 1.      MEMC has repeatedly asserted that the L-band is the same thing that is claimed in the '302 patent – in this litigation as to its pre-suit investigation, in the related litigation as to its alleged reduction to practice/enablement and in internal documents about the '302 patent. However, to avoid scrutiny of the Voronkov 1997 publication disclosing the L-band, MEMC told the Patent Office that the L-band is not "that which is claimed" in the '302 patent.
>
> 2.      MEMC made a false claim to priority to the April 1997 provisional application. During prosecution of the '380 patent, MEMC was faced with repeated rejections based on Voronkov prior art and Hourai publication. To overcome the rejection and to avoid scrutiny of the Park '610 patent (October 1997) that MEMC concurrently disclosed, MEMC falsely told the Patent Office that it was entitled to the April 1997 priority date. MEMC has admitted that the '302 patent is not entitled to that date, and the '380 patent is not entitled to it for the same reasons. Similarly, MEMC made a false claim to priority for the '302 patent.
>
> 3.      MEMC also failed to disclose the numerous and substantial contributions of Voronkov in the material disclosed in the '302 and '380 patents. For example, Voronkov reported to Falster that vacancy-perfect silicon could be "spread over the whole cross-section [of the crystal] for some longitudinal portion."
>
> 4.      MEMC failed to disclose invalidating commercial sales, which according to Falster and DeLuca, had "defect-free" vacancy regions that were something less than 15 mm wide and interstitial type regions that were 30-50% of the wafer radius. MEMC individuals did not disclose their belief that wafers having the claimed silicon material was sold in the U.S. more than one year prior to April 1998.
>
> 5.      MEMC knew that the only difference between its claims and the prior art was a

United States District Court
For the Northern District of California

dimensional aspect (15 mm), as admitted by MEMC's own patent expert, Larry Nixon. When the Patent Examiner stated his position that prior art processes would naturally result in the claimed silicon, MEMC specifically denied it. MEMC failed to disclose this inherent occurrence of "defect free" vacancy regions that were less than 15 mm wide.

6.      MEMC falsely represented to the Patent Office that the '302 patent results in (*i.e.*, enables) the claimed wafer to overcome rejection based on SEH's Takano patent, which the Patent Office Examiner determined taught the same slow cooling process parameters. However, MEMC knew the '302 patent was not enabled.

Opp. at 15-16. These six claims constitute the entirety[3] of SUMCO's evidence of *Walker Process* fraud. The Court addresses them in turn.

### a.      Reference to "L-Band" in Prior Art

SUMCO alleges that MEMC misleadingly represented to the PTO that a 1997 publication by Voronkov, et. al., containing a reference to an "L-band"[4] did not disclose the entirety of what was claimed in the '302 Patent, and therefore did not constitute anticipating prior art that could form the basis of a rejection of the patent. SUMCO's argument is based on a supplemental information disclosure statement in which MEMC disclosed a publication that addressed L-bands. Shoiket Decl., Ex. 76. In this paper, MEMC expressly called the Examiner's attention to the fact that "L-band silicon corresponds to vacancy dominated silicon that is substantially free of agglomerated vacancy intrinsic point defects." *Id.* SUMCO argues that since MEMC claimed in the Related Case that the '302 Patent covers "vacancy dominated silicon that is substantially free of agglomerated vacancy intrinsic point defects," this representation to the PTO was misleading.

However, as MEMC points out, SUMCO misleadingly quotes the supplemental information

---

[3]It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d at 1279. The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id.*

[4]The term "L-band" is apparently a term of art developed by Voronkov, et. al., and refers to a "band of heavy oxygen precipitation" located near the edge of a silicon ingot. Shoiket Decl., Ex. 76.

14

disclosure statement  by removing the operative language of the sentence. The entire sentence, from which SUMCO selectively quoted, reads: "However, Voronkov et al. fail to disclose that which is claimed in the present application; that is, Voronkov, et al. fail to disclose a single crystal silicon wafer comprising a first axially symmetric region in which vacancies are the predominant agglomerated vacancy intrinsic point defects wherein *the first axially symmetric region comprises the central axis or has a width of at least about 15 mm.*" *Id.* (emphasis added). Thus, MEMC not only pointed out the existence of the L-band in the prior art reference**,** but specifically distinguished it from the claims of the '302 Patent (i.e., that  the first axially symmetric region comprises the central axis or has a width of at least about 15 mm), an argument with which the PTO apparently agreed in subsequently granting the patent application. That SUMCO's expert came to a different conclusion regarding the *correctness* or *salience* of this distinction (*see* Powers Decl., Ex. 52 at ¶¶ 35-39) does not raise a triable issue of fact as to whether MEMC knowingly and willfully misrepresented material facts to the PTO.

### b.        Claim to Priority

SUMCO asserts that MEMC's decision to claim priority in the '380 Patent to the April 1997 provisional application was fraudulent because the provisional application is directed only to interstitial dominant defect-free regions, while, in SUMCO's opinion, the '380 Patent claims encompass both interstitial and vacancy dominant wafers. *See* Powers Decl., Ex. 142 ¶ 82. However, SUMCO presents no evidence that MEMC did not believe that the '380 Patent claim were limited to interstitial dominated silicon at the time, and therefore *knowingly* made misrepresentations to the PTO.  Indeed, the patent attorney who prosecuted the '380 patent application testified that the '380 patent only claims interstitial silicon. Shoiket Decl., Ex. 75 at 169:20-171:17.

Thus, while the parties may have a factual dispute regarding the breadth of the claims of the '380 Patent, SUMCO has failed to raise a triable issue of fact as to whether MEMC's representations to the

United States District Court
For the Northern District of California

PTO were fraudulent. SUMCO's citations to its purported expert's improper and self-contradictory legal conclusions (*see e.g.,* Powers Decl., Ex. 142, ¶ 82 ("I have no intention of testifying as to whether MEMC engaged in inequitable conduct or Walker Process fraud. However . . . there are genuine issues of material fact regarding whether MEMC engaged in fraud on the Patent Office in order to obtain allowance of these patents.")) and to the allegations in its *complaint* as evidence of fraud are not sufficient to withstand summary judgment.. *See Matsushita*, 475 U.S. at 586 n.11 (1986)  (the non-movant cannot merely rely on the pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment).

### c.    Voronkov's Contributions

SUMCO argues that MEMC's failure "to disclose the numerous and substantial contributions of Voronkov in the material disclosed in the '302 and '380 patents" constitutes *Walker Process* fraud. Opp. at 16. However, SUMCO provides absolutely no argument why failure to list Voronkov as an inventor, or failure to disclose his "numerous and substantial contributions," demonstrates fraudulent intent. Indeed, MEMC states that even assuming that Voronkov qualified as a co-inventor of the '302 patent, SUMCO cannot show that MEMC possessed a motive to deceive the PTO by misrepresenting who the inventors were because all "inventions and discoveries" Voronkov made in connection with his work for MEMC were contractually required to be assigned to MEMC. Shoiket Decl., Ex. 79 at § 6, MEMC 012564-012565; Ex. 80 at § 6, MEMC 012557. SUMCO presents no evidence to the contrary, and thus has failed to present evidence that the patents would not have issued "but for" MEMC's failure to disclose Voronkov's contributions to the '302 and '380 patents.

### d.    On-Sale Bar

SUMCO alleges that "MEMC failed to disclose invalidating commercial sales . . . MEMC individuals did not disclose their belief that wafers having the claimed silicon material was sold in the

U.S. more than one year prior to April 1998." Opp. at 16. The only colorable[5] evidence SUMCO cites in support of this argument is the deposition testimony of John DeLuca, former Vice President of Technology for MEMC.  In it, DeLuca states that he believed MEMC had sold "perfect" silicon, as covered by the '302 Patent, prior to 1998. However, DeLuca could not recall the specific product sold or when it was sold. Moreover, DeLuca admitted that he "perused" the '302 Patent but never "studied" it.  DeLuca Depo. at 132-33. This vague, uncorroborated testimony by an interested party who admits he only "perused" the '302 Patent is not sufficient to raise a triable issue of fact on this matter.

Finally, under 35 U.S.C. § 102(b), the "on-sale bar" only applies when "the invention was…on sale in this country." As MEMC points out, SUMCO makes no attempt to show that the purported sales occurred in the United States. SUMCO has failed to raise a triable issue of fact establishing the elements of an on-sale bar, let alone that MEMC fraudulent withheld disclosing the existence of an on-sale bar to the PTO.

### e.       Dimensional Aspect

The gravamen of SUMCO's argument with respect to the dimensional aspect of the claims in the '302 Patent is that "MEMC knew that the all the claim elements of the '302 patent were old except for the dimensional characteristic of 15 mm. [and] that even though MEMC did not point out what differentiated the claim from the prior art – the 15 mm – the Examiner would have somehow 'understood' this to be the argument." Powers Decl., Ex. 142, ¶ 75. SUMCO's supposed "expert" on patent prosecution, a "seasoned patent litigator,"who has prosecuted all of one patent during his entire career,[6] opines: "unless a patent applicant points out and argues what makes its patent claims

---

[5]SUMCO presents evidence that MEMC provided "semi-perfect" silicon to Samsung prior to 1998. However, Dr. Falster testified that this semi-perfect silicon fell outside the scope of the '302 Patent. Shoiket Decl., Ex. 82 at 248:21-249:6. SUMCO provides no evidence to the contrary.

[6]*See* SUMCO'S Opposition to MEMC's Motion to Exclude the Testimony of A James. Isbester, Docket No. 328 at 1.

United States District Court
For the Northern District of California

distinguishable over the prior art, it cannot be assumed that the Patent Examiner will just understand which element in a large combination of elements is the one that makes it different." *Id.,* ¶ 76.

However, there is no dispute that this dimensional aspect was in fact disclosed to the PTO. *See id.* ¶¶ 74-78; Ex. 141 at 48:2-49:3. SUMCO's argument that MEMC didn't do so "loudly enough" for its tastes simply assumes the PTO's incompetence, which is inappropriate, and is insufficient to raise a triable fact as to *Walker Process* fraud. *See In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003) (as "persons of scientific competence," PTO examiners are responsible for making findings, informed by their scientific knowledge, as to the meaning of prior art references, and those findings may establish non-obviousness).

### f.    The Takano Patent

SUMCO's final argument supporting its *Walker Process* fraud claim is that MEMC falsely represented to the Patent Office that the '302 Patent enabled the claimed wafer in order to overcome rejection based on the Takano patent, which the Patent Office Examiner determined taught the same slow-cooling process parameters as the '302 Patent. Opp. at 16.

MEMC distinguished the Takano reference by stating that it did not enable what the '302 patent enables, i.e., that its teaching resulted in silicon containing agglomerated intrinsic point defects, whereas the '302 Patent allegedly enabled silicon "substantially free of agglomerated vacancy intrinsic point defects." Shoiket Decl., Ex. 75 at 63:23-65:2. Indeed, MEMC presented detailed arguments in response to the examiner's concerns regarding the Takano patent. *See* Shoiket Decl., Ex. 61, MEMC A00240 (arguing that the Takano reference only taught a method of *reducing* agglomerated intrinsic point defects whereas the '302 Patent taught a method of substantially *eliminating* them). SUMCO argues that this was a misrepresentation because the '302 Patent did not in fact enable silicon substantially free of agglomerated vacancy intrinsic point defects. However, as with MEMC's arguments related to the L-

band reference, the examiner ultimately agreed with MEMC that the prior art did not disclose what was claimed in the '302 Patent. Moreover, SUMCO presents no colorable evidence that MEMC "knew" that the '302 Patent was not enabling, and in fact this determination was only made by this Court in 2006.

In short, SUMCO has presented no evidence suggesting actual fraud on the PTO within the meaning of *Walker Process*. While, if proven, the cited arguments might have shown that the patent was invalid, SUMCO presents no evidence that MEMC intentionally misrepresented facts to the PTO with the fraudulent intent requisite to show *Walker Process* fraud. As courts have repeatedly emphasized, *Walker Process* fraud goes well beyond inequitable conduct, and requires a showing of actual fraudulent intent. *See Walker Process,* 382 U.S. at 179-80; *Q-Pharma,* 360 F.3d at 1347; *Nobelpharma,* 141 F.3d at 1071.SUMCO has failed to present colorable evidence of such intent, and therefore, SUMCO  has failed to establish the existence of a triable fact with respect to its *Walker Process* fraud allegations.

### 2.      Sham Litigation

In the absence of a showing of *Walker Process* fraud, a patent owner may be subject to antitrust liability for the anticompetitive effects of an infringement lawsuit only if the accused infringer demonstrates that the lawsuit was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Q-Pharma,*, 360 F.3d at 1304. In order to constitute a "sham," a lawsuit must be "objectively baseless" in the sense that "no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors,* 508 U.S. at 60. "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail." *Id.*

### a.      The Prior Attorneys Fees Motion

As an initial matter, MEMC repeatedly notes that SUMCO brought claims similar to those in

United States District Court
For the Northern District of California

this lawsuit in its motion for attorney fees and sanctions in the Related Case, which this Court denied. This Court found, and the Federal Circuit agreed, that MEMC's pre-filing investigation was reasonable: "MEMC's belief, at the time it filed suit, that SUMCO's pure silicon wafers infringed the '302 Patent cannot be characterized as frivolous or unjustified." *See* Related Case, Docket No. 433 at 6. MEMC argues that since this Court, as well as the Federal Circuit on appeal, have already determined that the Related Case was not "frivolous or unjustified," *a fortiori* it was not "objectively baseless" as is required for the Court to determine that the Related Case was a sham.

However, as SUMCO points out, while the attorneys' fees motion was based on claims similar to those in this case, the focus in July 2004 was MEMC's "non-ideal" pre-suit investigation with respect to domestic versus foreign sales activity. For reasons that have never been made clear, rather than presenting the claims on which it now bases antitrust claims in the Related Case, either in the form of counterclaims or in the attorneys' fees motion, SUMCO chose to file another lawsuit in Delaware. Nevertheless, while probative of the issue of whether the related litigation was baseless, *see In Re Terazosin Hydrochloride Antitrust Litigation*, 335 F. Supp. 2d 1336, 1359 (S.D. Fla. 2004) (holding that a prior lawsuit was not "objectively baseless" as a matter of law, based on a previous finding by both the district court and the Federal Circuit that the suit was not "frivolous" or "unjustified"), the Court's ruling on the attorneys fees motion does not wholly foreclose SUMCO's current claims.

### b.    "Objectively Baseless"

Nevertheless, the premise of SUMCO's sham litigation argument – and, indeed, the premise of this entire lawsuit – is the erroneous equation of MEMC's failure to demonstrate a triable issue of fact in the Related Case with the legal determination that MEMC's claims were "objectively baseless" and therefore a sham. SUMCO relies heavily on this Court's summary judgment findings relating to infringement and enablement to argue that MEMC's prior lawsuit was a sham. *See e.g.* Opp. at 2 ("[t]his

**United States District Court**
For the Northern District of California

Court's *Daubert* and summary judgment rulings *directly establish* the objectively baseless nature of MEMC's enablement and infringement positions in the related litigation") (emphasis added). However, the Supreme Court has expressly rejected this ill-considered form of argument. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, n.5 (1993) (a "court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation"(citation omitted)).

At issue in this lawsuit is not whether MEMC's scientific claims were objectively false, or whether there is a triable dispute as to the adequacy MEMC's pre-filing testing and investigation; the issue is whether there is a triable issue as to whether MEMC's position in the Related Case was *objectively baseless*. While SUMCO has raised myriad factual disputes going to the *adequacy* of the pre-suit investigation, it has not raised any question that MEMC's claims were actually *baseless*. Indeed, the core claims of SUMCO's sham litigation charge – that MEMC's pre-filing infringement investigation was inadequate, and that MEMC asserted knowingly non-enabled patents – are simply repackaged versions of the invalidity arguments on which SUMCO prevailed in the Related Case, albeit with slightly different factual bases.[7] Indeed, the essence of SUMCO's sham litigation argument is exemplified by the following : "The Mule'Stagno testing is unreliable [as determined by this Court in the Related Case] -- *and thus, objectively baseless*." Opp. at 11 (emphasis added). However, like SUMCO's claims related to *Walker Process* fraud, while these arguments may have gone to the invalidity of the patents or to the admissibility of expert testimony, they do not raise a triable issue of fact as to whether the litigation was a sham.

As amply demonstrated by the appellate briefing and the history of the Related Case, the issues

---

[7] *See, e.g.,* Opp. at 7: "This Court has already found that the testing conducted by Mule'Stagno was insufficient as a matter of law to test for the claim limitations, and thus, the far lesser testing in the Competitor Analysis is likewise insufficient" (emphasis in original).

of validity and infringement have been – and are still – closely contested throughout this litigation. MEMC was entitled to the statutory presumption of validity under 35 U.S.C. § 282, and, as is its right, has tested that presumption in court. *See Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993 (9th Cir. 1979) ("Patentees must be permitted to test the validity of their patents in court through actions against alleged infringers.") That MEMC might ultimately be unsuccessful in this litigation – which is still currently on appeal – is insufficient to raise a triable issue of fact as to whether its claims were objectively baseless. In a case exhibiting a similar procedural posture and history to the instant one, the Federal Circuit held that the fact that a plaintiff's case was dismissed at summary judgment had no bearing on the question of whether the litigation was "objectively meritless." In *Covad Communications Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 677 (Fed. Cir. 2005), Bell Atlantic sued Covad for patent infringement. The district court, in a lengthy and detailed opinion, granted summary judgment in favor of Covad. *Bell Atlantic Network Services*, 92 F.Supp.2d at 499-500. Bell Atlantic appealed, and the Court of Appeals for the Federal Circuit, in another lengthy and detailed opinion, *see* 262 F.3d 1258 (2001), affirmed the judgment of the district court. However, "[t]hat Covad ultimately prevailed, of course, tells us little about whether Bell Atlantic's patent suit lacked objective merit." *Covad*, 398 F.3d at 677 (*citing Prof'l Real Estate Investors*, 508 U.S. at 60 n. 5). The court, in reviewing the arguments made by the plaintiff both in the district Court and on appeal, held that the fact that the plaintiff "advanced reasonable arguments that each court went to some lengths to reject" foreclosed a finding that "no reasonable litigant could [have] realistically expect[ed] success on the merits." *Id.*

Similarly, in the Related Case, MEMC advanced reasonable, if ultimately unsuccessful, arguments that both this Court and the Federal Circuit have gone to considerable lengths to reject. Indeed, MEMC's arguments on appeal were so persuasive that the Federal Circuit reversed this Court's initial granting of summary judgment and granted a limited remand on MEMC's active inducement

claims. *See MEMC Electronic Materials*, 420 F.3d at 1382. Moreover, both this Court and the Federal Circuit determined, based on SUMCO's arguments at the time (which were drawn from largely the same pool of evidence currently available to SUMCO) that MEMC's lawsuit "cannot be characterized as frivolous or unjustified." Such a history simply does not fit the profile of "objectively baseless" litigation. *See California Motor Transport*, 404 U.S. at 513 (recognizing that recourse to the courts should not be condemned as sham until a reviewing court has "discern[ed] and draw[n]" the "difficult line" separating objectively reasonable claims from "a pattern of baseless, repetitive claims ... which leads the factfinder to conclude that the administrative and judicial processes have been abused"); *see also Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000)("Because [the defendant] achieved favorable results," its efforts were "by definition, reasonable.") The Court therefore holds that MEMC's infringement lawsuit was not "objectively baseless" and, therefore, *Noerr-Pennington* immunity applies to SUMCO's antitrust claims.

### B.    The Patent Pooling Agreement

On April 1, 1997, MEMC entered into an agreement with Shen Etsu Handotai., Ltd., a Japanese corporation, whereby they mutually agreed to refraining from suing each other on the basis of their respective patents (the "patent pooling agreement'). SUMCO alleges that MEMC entered into the patent-pooling and non-assertion agreement for the anti-competitive purposes of "neutralizing" Shen Etsu Handotai in the United States and developing an all-encompassing patent domain on low defect silicon. MEMC responds that, though this is SUMCO's only allegation to which *Noerr-Pennington* immunity does not apply, it fails because courts have held that patent pooling agreements are in fact pro-competitive.

As an initial matter, it is not clear that the patent-pooling allegation stands as a separate basis for SUMCO's antitrust claim. Count I, "Attempted Monopolization," only explicitly refers to the lawsuit

23

United States District Court
For the Northern District of California

as the basis for the antitrust claim, and does not refer to the patent pooling agreement, and SUMCO appears to argue that the patent-pooling agreement was simply a part of MEMC's "overarching scheme" to improperly monopolize the market for perfect silicon. *See* FAC, ¶¶ 68-75. Accordingly, it is not clear that MEMC is correct that the *Noerr-Pennington* doctrine does not wholly immunize it against Count I, and therefore such immunity provides independent grounds to dispose of Count V.

Patent pools are addressed using a "rule of reason" analysis, which broadly examines the business practices and related market factors to determine whether the questioned practice imposes an unreasonable restraint on competition. *Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 376 (D. Del. 2004).  Courts have acknowledged the many pro-competitive benefits and efficiencies of patent pools, including "integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement" *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1193 (Fed. Cir. 2005) (quoting U.S. Department of Justice and Federal Trade Commission, *Antitrust Guidelines for the Licensing of Intellectual Property* § 5.5 (1995)).  However, some types of pooling arrangements can have anti-competitive effects, such as those involving substitute goods or those requiring payment for a pool of rights without any opportunity to license individually from an individual owner.  *Cinram*, 299 F. Supp. 2d at 376-77.

Courts have repeatedly held that if the antitrust plaintiff had the opportunity to license independently from individual owners of copyright or patent rights engaged in a pooled activity, then the pool of rights does not restrain trade in violation of the conspiracy provision of the Sherman Act. *See id*; *see also Columbia Broad. Sys. Inc. v. American Soc'y of Composers, Authors and Publishers*, 620 F.2d 930, 936 (2d Cir.1980) (the true issue in situations involving a pool of rights is whether the antitrust plaintiff lacked a "realistic opportunity" as a "practical matter" to obtain individual licenses from individual owners as opposed to a single license from the pool). In *Cinram*, the court found that

United States District Court
For the Northern District of California

the patent pool did not violate antitrust laws because there was an opportunity to obtain individual licenses from individual owners as opposed to a single license from the pool. *Id*. at 377. Similarly, here, SUMCO was specifically presented with the opportunity to obtain an individual license from MEMC under the '302 patent but rejected all of MEMC's offers. *See* MEMC's pleasantly-worded April 17, 2000 invitation to SUMCO to license the '302 patent technology, Powers Decl., Ex. 11. Thus, the patent-pooling agreement was not anticompetitive.

Moreover, SUMCO offers no evidence of anticompetitive effects resulting from the pooling agreement. SUMCO's offered evidence states only general facts about MEMC's market involvement and does not directly address the any anticompetitive effects related to the patent pool. Opp'n 17:13-21. SUMCO has failed to raise a genuine issue material fact with regard to the alleged anti-competitive effects of the pooling agreement.

## II.    Patent Misuse

MEMC argues that Count V, alleging patent misuse, should be dismissed for failure to state a cause of action. Mot. at 1:19-20. The doctrine of patent misuse is an extension of the equitable doctrine of unclean hands, "whereby a court of equity will not lend its support to enforcement of a patent that has been misused." *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1427-28 (Fed. Cir. 1997) (*citing Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 668 (Fed.Cir.1986)). Patent misuse arose as an equitable defense "to restrain practices that did not in themselves violate any law, but that drew anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed. Cir. 1992).

MEMC argues that patent misuse is not an independent cause of action, but rather an affirmative defense to a charge of infringement, and points to a number of cases directly supporting this proposition. *See Enercon GMBH v. Erdman*, 13 Fed. Appx. 651, 652 (9th Cir. 2001) ("patent misuse is an

25

affirmative defense to a suit for patent infringement, not an independent cause of action"); *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1090 (W.D. KY 1995) ("Patent misuse cannot be the basis of a cause of action.   Rather, it is an *affirmative defense* to a patent holder's claim of infringement"(emphasis in original)); *Abbott Laboratories*, 124 F.3d at 1427-28 ("the defense of patent misuse may not be converted to an affirmative claim for damages simply by restyling it as a declaratory judgment counterclaim"). The clear import of these and additional Federal Circuit cases is that it is settled law that patent misuse is an affirmative defense. *See U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1184 (Fed. Cir. 2005) ("Patent misuse is an equitable defense to patent infringement"); *Windsurfing Intern. Inc. v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed. Cir. 1986) ("patent misuse is an affirmative defense to a suit for patent infringement").

SUMCO cites no cases in which patent misuse was permitted as an independent cause of action. Instead, SUMCO contends that patent misuse "may also serve as an element in a complaint charging antitrust violation," citing *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 668 (Fed. Cir. 1986).  SUMCO argues that because antitrust claims are still pending in this case, the motion to dismiss Count V should be denied.  Opp'n at 24:19-23. However, SUMCO fails to acknowledge that it in fact introduces patent misuse as a separate cause of action in Count V of its Amended Complaint.  As noted above, patent misuse is an affirmative defense that "arose to restrain practices that did not in themselves violate any law."  *U.S. Philips Corp.*, 424 F.3d at 1184.  While it may serve as an "element" of an antitrust claim, it cannot serve as an affirmative claim for damages. *See Abbott Laboratories*, 124 F.3d at 1427-28. Therefore, SUMCO's separate cause of action alleging patent misuse in Count V should be dismissed.

**III.   Standing, Damages Causation**

Because the Court has determined that SUMCO has failed to present a triable issue of fact as to Counts I and V, the Court need not consider MEMC's arguments related to SUMCO's alleged lack of

**United States District Court**
For the Northern District of California

standing to bring its antitrust claims or its inability to prove that its alleged damages flowed from MEMC's conduct.

**V.      Motions to Exclude, Evidentiary Objections**

The parties spilled much ink over MEMC's motions to exclude the testimony of attorney A. James Isbester, Dr. Frank M. Gollup, and Carl G. Degen, and MEMC's objections to SUMCO's evidence submitted in support of its opposition to MEMC's Motion for Summary Judgment and Motions to Exclude. Since it did not reach the issues of damages causation, the Court did not consider the testimony of Degan and Gollup, SUMCO's damages experts, and therefore the motions to exclude their testimony is denied as moot. To the extent it considered any of the testimony of Isbester, the Court has found that it fails to raise a triable issue of fact on as to issue and therefore denies as moot the motion to exclude his testimony. MEMC's objections to other evidence submitted by SUMCO in support of its oppositions are likewise overruled as moot, as the evidence presented failed to raise a triable issue of fact as to any issue. *See Monolithic Power Systems, Inc. v. Taiwan Sumida Electronics, Inc.,* 2007 WL 1831118, *10 (N.D. Cal. 2007).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court GRANTS Defendant's Motions for Summary Judgment and for Judgment On The Pleadings. Defendant's motions to exclude testimony are DENIED AS MOOT. Defendant's Objections to Plaintiffs' Evidence Submitted In Support of Its Opposition to Defendant's Motion for Summary Judgment and Motions to Exclude are OVERRULED AS MOOT.

IT IS SO ORDERED.

Dated: 8/13/07                             _____
                                          SAUNDRA BROWN ARMSTRONG
                                          United States District Judge